342

George **RALLATOS**, Libelant,

v.

**GREEK S.S. MATROZOS**, etc., et al.,
Respondent.

**Admr. No. 447.**

United States District Court
E. D. Virginia,
Newport News Division.

Feb. 19, 1964.

Burt M. Morewitz, Newport News, Va., for libelant.

Charles F. Tucker, Norfolk, Va. (Vandeventer, Black, Meredith & Martin), Norfolk, Va., for respondent.

WALTER E. HOFFMAN, Chief Judge.

This Greek seaman seeks a recovery from the owners, operators, and masters of the Greek S.S. MATRÓZOS. Service was effected against Phopan, S.A., the owner of said vessel; the corporate owner being organized and existing under the laws of the Republic of Panama and/or the Republic of Costa Rica. Service was also had as to Phocean Ship Agency, Ltd., a corporation organized and existing under the laws of the United Kingdom.

The amended and supplemental libel alleges four causes of action. The third and fourth causes of action allege negligence and unseaworthiness resulting in an illness and failure to treat. These causes of action were abandoned at the time of trial. Indeed, there is no proof to support same. The first cause of action alleges a violation of 46 U.S.C. § 599 relating to advances against future earnings; the failure to pay base wages; the failure to pay overtime and vacation pay and days off duty as provided by various provisions of the Labor Code of Panama, the Labor Code of Costa Rica, and/or the Greek Collective Agreement of December 7, 1956; the withholding of earned wages in violation of 46 U.S.C. §§ 596, 597, and 599; the contention that libelant, who signed aboard the vessel as an apprentice officer, was required to perform duties as an A/B seaman and therefore entitled to the highest rate of wages for seamen performing the same duties, i. e., wages applicable to an A/B seaman; the failure to pay the full balance of earned wages, including overtime and vacation pay, although demanded by libelant. The second cause of action, reiterating the allegations set forth in the first cause of action, claims the "waiting time" provisions under 46 U.S.C. §§ 596, 597. The respondents filed a general denial of the allegations contained in the first and second causes of action.

Libelant testified that he was first engaged for service in Greece during the early part of March, 1957; he joined the vessel at Emden, Germany, on or about March 12, 1957, and paid his own expenses from Pireaus, Greece.[1] He further stated that he signed on as an apprentice officer at £15 per month. He contends that, throughout the time of his service aboard the vessel, he did the work of an A/B seaman, working eight hours per day.

Disposing of this contention, we have no authority cited to support the view that an apprentice officer, brought aboard the vessel for the specific purpose of training in advance of being made an officer, is entitled to the rate of pay earned by a seaman or officer whose duties may have been fulfilled by the apprentice officer. Chapter IX of the Greek Collective Agreement forbids, other than in an extraordinary emergency, the use of "deck officers" for manual work, but

---

1. The practical effect is as libelant stated. The wage account reflects that he was given an advance in Greece, and this was deducted from his initial wage account.

this is inapplicable to an apprentice officer. The schedule of wages for an apprentice officer under the Greek Collective Agreement calls for £15.0.0, subject to certain exceptions after one and two years service which are not applicable to this controversy. The vessel flies a Greek flag and as the wage item touches the internal management of the vessel, the law of the flag applies unless there is a violation of the statutes of the United States with respect to wages. To adopt libelant's theory would destroy the purpose of using trainees designated as apprentice officers; certainly these apprentice officers must become familiar with the work of an A/B seaman before being qualified as an officer.

▇▇▇ At the time of argument it was agreed that there may have been advances against future earnings made in the United States. On libelant's first voyage to the United States (which was also the maiden voyage for the vessel) a payment of $5.00 was made at Norfolk, Virginia. As the vessel sailed from Emden, Germany, on March 23, 1957, arrived at Norfolk on April 8, and as the first wage account ran through April 30, 1957, with gross wages earned in the sum of £24.10.0, with the shipowner deducting the advance of £20 given in Piraeus, Greece, it is undeniably true that this constituted an advance against future earnings. The next alleged advance appears on the wage account for the period May 1–May 31, indicating $5.00 advanced in Newport News. This must have been on either May 8 or May 9 as these were the only days the vessel was in Newport News during that month. As the shipowner carried over a debit balance due by the seaman from the previous month's wage account (which balance would not have been repaid by May 9) it follows that this item constituted an advance against future earnings made in the United States. A payment of $10.00 was made to libelant during June while the vessel was again at Newport News, on some date between June 5 and June 12. As the seaman had a small credit balance carried over from the May wage account,

and as the $10.00 payment to the seaman is the first deduction shown, it is possible that this does *not* constitute an advance against future earnings; it having been possible for the shipowner to be indebted to the seaman at the particular time of payment. Once again in July a payment of $10.00 was made to the libelant while the vessel was at Newport News from July 10–12. As the shipowner carried over a debit balance due by the seaman from the June 30 wage account, the July payment of $10.00 constituted an advance against future earnings. A $5.00 payment made in August, marked on the wage account at Newport News although the vessel's itinerary reflects that the ship was at Norfolk from August 9 to August 12, would *not* appear to have been an illegal advance as the shipowner carried over a credit from the July account due the libelant. The next wage account covers a period of two months and four days—from August 27 to October 30. A payment of $15.00 is indicated as having been made to libelant at Newport News. The ship's itinerary discloses that she visited Norfolk on two occasions, September 8–9 and October 10–15. As the entry appears on the wage account following a payment to libelant made in Hamburg while the vessel was there from September 23–28, it is a fair assumption that this item of $15.00 was paid to libelant on some date between October 10–15, at a time when wages were due to libelant. Therefore, the payment of $15.00 made in October was *not* an illegal advance. A final payment of $10.00 was made in Newport News on or about November 15, 1957, when there were wages due the libelant. The foregoing summarization of alleged advances against future earnings is intended as a guide for proctors indicating the views of the Court, but proctors are at liberty to consummate any agreement with respect to these items.

▇▇▇ The libelant was taken ill and sent to the hospital in Newport News on November 16, 1957. At that time it was an emergency case but libelant improved and on December 2, 1957, was dis-

charged "as very much improved" and "able to resume his former occupation." By letter dated December 15, 1957, libelant, through his proctor, made his first demand for the balance of earned wages. On December 17, 1957, the sum of $34.25 was paid to libelant, purportedly representing the balance due on earned wages. The record further indicates that the vessel's agents made payments of $20.00 each on November 24 and November 29, respectively. Written on these receipts in handwriting other than that of the drawer or the libelant are the words "sick" and "sick pay." In any event, the circumstances of libelant's emergency illness and any delay in paying the balance of earned wages do not constitute proper cause for the imposition of the "waiting time" provisions requiring two days' pay for every delayed day's payment.

Libelant claims overtime compensation. In this connection, Chapter VI of the Greek Collective Agreement provides, in part, as follows:

"Chapter VI—Additional Work Not Giving Right to Any Overtime Whenever It May be Done. No overtime is paid to officers and to lower ratings for the following jobs which, however, they are required to carry out even beyond the regular working hours at any time and any day in the week.

\* \* \* \* \* \*

"(d) For work done by apprentices and deck boys up to two hours per day for their education."

Under Chapter VIII under the heading "Jobs Giving Right to Special Pay," it is said:

"(b) For cleaning the holds and the deep tanks, a special remuneration is paid of 8 English pounds per hold for ships of 3,000 tons, d. w., and 15 to 16 English pounds per hold for ships of over 3,000 tons, d. w., according to the nature of the cargo.

"For ships of approved regular lines, in the case of general cargo, this remuneration is fixed at 8 English pounds minimum up to 12 pounds maximum per hold and per round voyage of the routes. In regard to cargoes, other than those that are usually carried by ships of approved regular lines, the same remuneration is fixed as in regard to other tramp steamers, namely, 12 to 16 English pounds per hold according to the nature of the cargo."

█ It is the contention of proctor for libelant that libelant worked on the deep tanks on the last voyage, leaving Hamburg on October 31, 1957, arriving Newport News on November 15, 1957. The overtime records submitted by respondent do reflect that libelant assisted in cleaning the deep tanks on some of the prior voyages for which he received overtime or "special" pay—the rate to be subject to adjustment, if any, at the time of presentation of the decree—on the following dates: May 24, June 28, July 27 and August 27. The last voyage does not reflect any work on the deep tanks and is limited to four hours overtime at Hamburg on October 31 for "preparing ship for sea." The final wage account discloses payment for two hours overtime (see Chapter VI(d) authorizing payment for overtime only in excess of two hours worked by apprentices). Subject to possible recomputation as to rate of pay for prior voyages, we conclude that libelant did not perform work in cleaning the deep tanks on his final voyage. In other respects the overtime records appear to coincide with the wage accounts.

█ Libelant having served six months continuous service on the same ship, he falls within the provisions of Chapter XV of the Agreement pertaining to "Leaves." Under Chapter XV(2) it is said:

"If a seaman has completed 6 months continuous service on the same ship, or on ships of the same owner, and has been discharged not through his own fault (his being discharged on account of sickness not constituted as his fault) before the expiration of his engagement

contract, he can be granted a leave for the number of months he served in the proportion laid down in the preceding paragraphs."[2]

It is further provided in Chapter XV (5):

"After the end of each voyage lasting more than ten days, one day off-duty is allowed to the seaman in port."

The documentary evidence shows that libelant was apparently paid under "overtime" on the following days: April 22, May 22–23, June 29–30, July 20–30, August 29 and October 28. This is not to suggest that libelant actually received these days "off-duty" but apparently he was paid for same. On his last voyage which resulted in his discharge due to illness, he was not paid, unless it was included in sick wages. However, an examination of the Greek Collective Agreement grants no rights for pay in lieu of a day off, it being provided under Chapter XV(6) (7), immediately following the reference allowing one day off in port, as follows:

"(6) The Master details the men to whom the aforesaid day-off is allowed according to ship's requirements, and he can put off giving same until a suitable time if the ship's requirements call for it, but not beyond a second voyage.

"(7) A seaman cannot demand payment of proportion of wages instead of a day off, except if this leave was allowed him after the end of the second voyage."

Libelant was on his seventh voyage when he became ill. He was not entitled to claim a day's pay until the end of his second voyage. In all, he was allowed nine days' pay under "overtime" for his "days off." He is entitled to no more.

We think that libelant's claim for eight days' leave pay under Chapter XV (2) has merit. Actually the libelant did not testify that he was not given this leave pay but the wage accounts clearly show that nothing was paid to him under this provision of the Agreement. Perhaps the reason is that he had not completed six months of continuous service until September 12, 1957. Respondent should now be required to pay libelant for these eight days at the regular rate of pay, without penalty or interest.

■ Libelant is also entitled to reimbursement to the extent of £20.0.0 for his expenses from Greece to Germany at the time of his initial employment in March, 1957. He conceded that he knew, after one year's employment, he would have this amount reimbursed to him. Actually this sum was advanced to libelant and later deducted from his first wage account. Respondent argues that the reason for not reimbursing the travel expense prior to one year's service is to discourage desertion from the ship. Whatever may be the motive, the Greek Collective Agreement, which constituted the contract between libelant and the vessel's owners, provides in Chapter XII (7):

"In case the engaged seaman has to travel in order to meet the ship on which he is to be signed on, his wages, including also his maintenance, commence on the day of arrival at the port where it has been agreed that he should be signed on. *He is paid all his traveling expenses.*"

A computation under Chapter XII(7) could revise the issue concerning advances against future earnings, but since respondent elected to deduct the travel expense from libelant's wages we will assume that respondent considered this item as an indebtedness due by the seaman. Libelant is clearly entitled to the £20.0.0. If these travel expenses are not to be reimbursed until after one year's service, the remedy lies in a modification of the Collective Agreement.

As no argument is made with respect to the amount of special wages stipulated

---

2. The "preceding paragraphs" would entitle libelant to one day per month of service. This would be a total of eight days for eight months' service.

for sick men treated off the ship under Chapter XIV, the Court assumes that the total sum of $40.00 paid to libelant is the correct amount.

While the respondent has substantially prevailed, there was an apparent violation of the United States wage statutes covering advances against future earnings and, for this reason, costs will be assessed against the respondent Phopan, S.A.

A decree will be prepared and presented for the amount found to be due in accordance with this memorandum which is adopted by the Court in lieu of specific findings of fact and conclusions of law. There being no evidence that Phocean Ship Agency, Ltd., is involved, the libel against this respondent will be dismissed and the decree will be against Phopan, S.A., only.