Dominic B. ARGUELLES, Appellant,

v.

U. S. BULK CARRIERS, INC., a body corporate, Appellee.

No. 11640.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 12, 1968.

Decided April 4, 1969.

Haynsworth, Chief Judge, dissented.

I. Duke Avnet, Baltimore, Md. (Avnet & Avnet, Baltimore, Md., on brief), for appellant.

George W. Sullivan, New York City (William J. Little, Baltimore, Md., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and BOREMAN and BRYAN, Circuit Judges.

BOREMAN, Circuit Judge:

This suit was brought by Dominic B. Arguelles, a merchant seaman, for wages, including earned overtime, reimbursements, and statutory penalties for delay in payment of wages, all allegedly due from the defendant, U. S. Bulk Carriers, his employer. Jurisdiction is asserted under 28 U.S.C.A. § 1333, the case involving admiralty and maritime claims. Defendant's motion for summary judgment was granted for the reason that the seaman had not used the grievance machinery and procedure provided by a collective bargaining agreement between his labor union and his employer. From the order granting summary judgment plaintiff appeals. We reverse.

The plaintiff, a merchant seaman and a citizen of the Philippine Islands, has been a resident of Baltimore, Maryland, for a number of years. He joined the American merchant vessel, S/S "U. S. PECOS," at Galveston, Texas, on August 3, 1965, as ordinary seaman on six month articles of employment at the agreed monthly wage of $304.90. Six months later, on February 3, 1966, the vessel, with cargo to be discharged at Saigon, South Vietnam, arrived off Cap St. Jacques where it remained at anchor until February 13, 1966. This delay was admittedly due to the fact that there were several other vessels awaiting their turns to discharge cargo ahead of the Pecos. On February 13, 1966, with pilot and customs officer aboard, the vessel proceeded from its anchorage and arrived some six and one-half hours later at designated Buoy No. 13 in the Port of Saigon. The plaintiff, however, claims that he was entitled to be discharged and put ashore on February 3, 1966, and to be paid within four days thereafter.

The vessel's Deck Log was before the court as an exhibit filed with the defendant's affidavit in support of its motion for summary judgment. This log shows an entry on February 3, 1966, as follows: "Free pratique and custom clearance not authorized at this anchorage." The log further shows that the vessel was granted pratique and clearance on February 13, 1966, after the vessel was secured to Buoy No. 13 in the Port of Saigon. In his deposition plaintiff stated that on another occasion within his six month period of service when the vessel was at anchor at a point near the anchorage of February 3, he was granted shore leave and transportation ashore was provided by the ship.

Before and from the time of arrival at anchorage off Cap St. Jacques, and until arrival in the Port of Saigon, sea watches were constantly maintained. These watches were broken on February 13 *in* the Port of Saigon. While at anchorage off Cap St. Jacques frequent anchor bearings were taken each day. Unloading of cargo commenced in the Port of Saigon on February 16, 1966. Discharging of approximately 350 tons of cargo was concluded on February 18, 1966.

The Deck Log for February 17, 1966, reflects an entry indicating that plaintiff and certain other members of the crew were repatriated to the U. S. A. on that day and that they had been paid *by voucher* at the American Consulate. The Deck Log for February 18, 1966, shows an entry indicating that other members of the crew were repatriated to the U. S. A. on that day and that they had been paid *by voucher* at the American Consulate.

It is undisputed that plaintiff was given a voucher in the presence of the U. S. Consul at Saigon, calling for payment at Galveston, Texas, of all of his agreed basic monthly salary then due at the rate of $304.90, and that the master of the Pecos gave to plaintiff and each repatriated crewman the sum of $50.00 in American money for food and miscellaneous travel expense en route to the U. S. A. Plaintiff was provided also with a ticket calling for first class air travel and accommodations from Saigon to Galveston, Texas.

In his deposition plaintiff explained that his departure with his companions from Saigon was delayed from February 17 until the following day, February 18, because they had an argument with the U. S. Consul over their demand for payment in U. S. dollars rather than by voucher. As a consequence plaintiff missed his flight on February 17, could not get first class air transportation on the following day and traveled second or "tourist class" from Saigon to Los Angeles, California. However, from Los Angeles to Houston, Texas, he traveled first class by air. Instead of flying on to Galveston, as his ticket provided, plaintiff, with companions, elected to go by limousine from Houston to Galveston, his share of the cost being $6.50. Four days later, on February 22, 1966, plaintiff presented himself at the office of Bulk Carriers in Galveston and was paid the amount specified in the voucher presented to him at Saigon. There is nothing in the record to support the plaintiff's claim in his brief that, through fault of the defendant, he had to wait a few days in Galveston before he was paid off there on February 22, 1966.

Plaintiff initially sought judgment for the following:

(1) A sum representing the difference between the cost of a ticket for first class air travel from Saigon to Galveston provided by Bulk Carriers and the cost of less expensive air transport accommodation actually provided, plus an excess baggage charge of $8.50 from Los Angeles to Houston and shared limousine expense of $6.50 from Houston to Galveston.

(2) Balance of claimed overtime earnings of which $59.00 was allegedly attributable to overtime work claimed to have been performed on the vessel prior to February 3, 1966, and $88.00 of claimed overtime compensation because he was unjustifiably restricted to the vessel for eleven days in South Vietnam.

(3) *Statutory penalty* of $254.95 on account of claimed delay in payment of wages calculated on the basis of two days' pay for each day from February 3, 1966, to February 22, 1966, less the first four days, or for a net period of fifteen days.[1]

 During the course of proceedings it was suggested to the plaintiff

---

1. Title 46 U.S.C. § 596 provides, in pertinent part, that the master or owner of any vessel making foreign voyages shall pay to every seaman his wages within twenty-four hours after the cargo has been discharged, or within four days after the seaman has been discharged, whichever first happens; and in all cases the seaman shall be entitled to be paid at the time of his discharge on account of wages a sum equal to one-third part of the balance due him. Every master or owner who refuses or neglects to make payment in the manner prescribed *without sufficient cause* shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed beyond the respective periods, which sum shall be recoverable *"as wages in any claim made before the court."* (Emphasis added.)

that he could obtain an adjustment directly from the air carrier of the difference between the cost of first class air travel and the cost of less expensive accommodation. Acting upon this suggestion the plaintiff obtained such adjustment and this claim was abandoned. In argument counsel for the plaintiff referred to the items of $8.50 for excess baggage charge and $6.50 for limousine expense as "minor items" of little importance. In any event, there is no explanation which would show any necessity for the limousine expense from Houston to Galveston since plaintiff's airline ticket admittedly covered transportation between those two points. The $50.00 in cash for miscellaneous travel expense would more than cover the excess baggage item of $8.50. Thus, all that remained of the original claims were the claims for overtime earnings [2] and the statutory penalty for delayed payments as provided in 46 U.S.C. § 596.

It appears that there were two factual issues to be resolved: (1) Whether the plaintiff was entitled to overtime compensation during his period of service aboard ship prior and subsequent to February 3, 1966; (2) whether the master's delay of fifteen days after February 3, 1966, in the payment of plaintiff's wages was "without sufficient cause" within the meaning of § 596.

■ As hereinbefore shown Arguelles signed six months' shipping articles commencing August 3, 1965. When the Pecos was anchored at Cap St. Jacques and awaiting instructions to proceed to Buoy 13 in the Port of Saigon it was carrying cargo which had been loaded prior to February 3, 1966. In the affidavit filed with defendant's motion for summary judgment affiant describes himself as Manager of Marine Personnel for the defendant, Bulk Carriers, and states only that his knowledge and information of the matters set forth "were acquired by

him in the course of his employment by said corporation"; he then states in the affidavit that, since the cargo had been loaded within the six-month period prior to February 3, 1966, the shipping articles were automatically extended until the cargo was completely discharged. The articles are not filed with the affidavit and do not appear in the record. Rule 56(e) F.R.Civ.P. provides that such an affidavit "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." An affidavit based upon information acquired by affiant in the course of his employment as Manager of Marine Personnel, without more, would not meet even the minimum requirements of Rule 56(e). The sufficiency of this affidavit was challenged in plaintiff's answer to the motion for summary judgment.

It is agreed that plaintiff was a member of the National Maritime Union of America, an affiliate of AFL-CIO, and that there was a working agreement between the union and various companies and agents, including the defendant.[3] In substance the agreement provides that an employee who feels he has been unjustly treated or subjected to unfair consideration shall endeavor to have his grievance adjusted by pursuing certain grievance procedures and if a mutually satisfactory settlement is not thereby effected the dispute will be promptly referred to an impartial arbitrator for decision and disposition.

The plaintiff claims that he rightfully demanded that he be put ashore and demanded payment of his wages; that these demands were refused; that when the voucher was paid at Galveston, Texas, he demanded overtime pay, adjustment of the difference in the cost of inferior flight accommodations actually

---

2. Overtime pay is embraced within the meaning of "wages." *See* Monteiro v. Sociedad Maritima San Nicolas S.A., 280 F.2d 568, 573 (2 Cir. 1960); Norris "The Law of Seamen," Vol. 1, sec. 47, pp. 76, 77.

3. This agreement was introduced in evidence as Joint Exhibit No. 1.

provided and accommodations as agreed, and the other minor items expended for excess baggage charges and limousine fare but the demands were refused; that he then complained to the Galveston representative of his union but was advised to write a letter to the union representative in Yokohama, Japan, and report his alleged mistreatment. Instead of writing the letter plaintiff went to Baltimore, employed counsel and this litigation followed. The defendant denied all of plaintiff's claims. It is agreed that no steps were taken under the grievance procedure of the collective bargaining agreement in an effort to resolve the disputes which had arisen between plaintiff and his employer.

In a short statement, orally from the bench, the district court expressed no view as to the merits of the dispute but granted the motion for summary judgment, holding, in effect, that the plaintiff's claim must be processed in accordance with procedures established in the collective bargaining agreement, that matters of this sort should be left to procedures set up between the union and the employer pursuant to the "policy" established primarily in Republic Steel Corp. v. Maddox, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965); and Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), a policy characterized by the district court as most important "lest this Court be inundated with small claims of the type which has been presented to the court today."

In granting the motion for summary judgment the court denied to the plaintiff a hearing on the merits and it clearly appears that there were genuine issues of material fact which could not be resolved on the basis of the pleadings, deposition, or the insufficient affidavit filed by the defendant in support of its motion. Summary judgment was granted on the ground and for the reason that the plaintiff's claims *must* first be processed in accordance with procedures established

in the agreement between his employer and the union. This determination was tantamount to a ruling that the court lacked jurisdiction.

Title 28 U.S.C. § 1333 provides:

"The district courts shall have original jurisdiction, exclusive of the courts of the States, of:

"(1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled."

The controversy here was between a merchant seaman and the owner of an American merchant vessel, a controversy maritime in nature, and the cause of action was based, at least in part, upon the alleged violation by the defendant of a federal statute providing penalties for delay in the payment of plaintiff's wages "without sufficient cause."

■ The pertinent statute, 46 U.S.C. § 596, provides, in substance, that any sum found to be due as a penalty for such delay shall be recoverable "as wages in any claim made before the court." We think the phrasing of the statute, "in any claim made before the court," is highly significant in the context of the instant case and carries the clear implication that the district court should determine whether payment of wages was delayed and, if so, should award to plaintiff the prescribed penalty "as wages" unless the cause for such delay is found to be "sufficient."

■ Since ancient times seamen have been accorded special protection by their Governments and Courts, particularly with respect to the prompt payment of wages due them.[5] The right to prompt payment of seamen's wages is especially favored by the law. The official concern for seamen, this very useful band of men, is motivated more by practical than by romantic considerations. Their contribution is seapower and manifests itself in commerce and national defense.[5]

4. Benedict on Admiralty, Vol. 4, sec. 621, p. 282.

5. A well documented discussion by Judge Frank concerning the historical protec-

To assume their special position in the scheme of things judicial, seamen are treated as wards of the admiralty. Only recently the Supreme Court of the United States spoke of "the maintenance of a merchant marine for the commercial service and maritime defense of the nation by inducing men to accept employment in an arduous and perilous service." Calmar S. S. Corp. v. Taylor, 303 U.S. 525, 528, 58 S.Ct. 651, 653, 82 L.Ed. 993.

■■■■ To effectuate this well-established governmental and judicial policy the Congress has enacted statutes to insure prompt payment to the seaman of wages due him. As provided in 46 U.S.C. § 596, wages in foreign trade are due and payable within twenty-four hours after the cargo has been discharged or within four days after the seaman has been discharged, whichever happens first, and he is entitled to one-third of his wages at the time of discharge. If the master fails to pay seamen, "without sufficient cause," the master or the owner is subjected to the payment of double wages for each day of delay. Vigorous judicial interpretations have been given to the wage statutes. The Supreme Court has said that the statutes pertaining to the payment of wages intend to secure *prompt* payment and are designed to prevent "arbitrary refusals to pay wages, and to induce prompt payment when payment is possible." [6] The courts strongly disapprove denial of prompt payment of seamen's wages rightfully due them.[7] The wage statutes are to be liberally construed in favor of the seaman.[8] As hereinbefore noted, overtime pay is embraced within the meaning of wages. If delay in payment of wages is established the burden of proof is on the ship owner to show that his delay was justified.[9]

The district court, in reaching its decision, relied principally upon recent cases which hold that where an employee seeks to sue his employer and/or his union on account of an alleged breach of his collective bargaining *rights emanating from a collective bargaining contract* between his employer and his union he must first show that he has attempted to pursue the contract grievance procedure as his mode of redress. Republic Steel Corp. v. Maddox, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965). Only if the union refuses to press the claim or if it presses it perfunctorily, then the employee may seek redress in the courts. Republic Steel Corp. v. Maddox, *supra;* Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). In Vaca v. Sipes the Court stated:

> "* * *. Since the employee's claim is based upon *breach of the collective bargaining agreement,* he is bound by terms of that agreement which govern the manner in which contractual rights may be enforced. For this reason, it is settled that the employee must at least attempt to exhaust exclusive grievance and arbitration procedures established by the bargaining agreement. Republic Steel Corp. v. Maddox, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580." (386 U.S. at p. 184, 87 S.Ct. at p. 914.) (Emphasis supplied.)

---

tion of seamen is found in Hume v. Moore-McCormack Lines, 121 F.2d 336 (2 Cir. 1941), cert. denied, 314 U.S. 684, 62 S.Ct. 188, 86 L.Ed. 547.

6. Collie v. Fergusson, 281 U.S. 52, 56, 50 S.Ct. 189, 191, 74 L.Ed. 696 (1930). Involved was 46 U.S.C. § 596. Insolvency of the owner and arrest of the vessel were held to be "sufficient cause" for delayed payment of wages and to relieve the owner from the statutory liability for double wages.

7. Prindes v. The S. S. African Pilgrim, 266 F.2d 125, 128 (4 Cir. 1959); The Sonderborg, 47 F.2d 723 (4 Cir.), cert. denied, 284 U.S. 618, 52 S.Ct. 7, 76 L.Ed. 527 (1931); The Lake Gaither, 40 F.2d 31 (4 Cir. 1930).

8. Johnson v. Isbrandtsen Co., 190 F.2d 991, 993 (3 Cir. 1951).

9. Butler v. United States War Shipping Administration, 68 F.Supp. 441, 443 (E. D.Pa.1946).

The defendant cites certain cases purporting to show that the courts have been applying the principles approved in *Maddox* and *Sipes* to the maritime area of the law. Reference is made to Freedman v. National Maritime Union of America, 347 F.2d 167 (2 Cir. 1965), cert. denied, 383 U.S. 917, 86 S.Ct. 910, 15 L.Ed.2d 671 (1966); and Brandt v. United States Lines, 246 F.Supp. 982 (S.D.N.Y.1964).

*Freedman, supra,* involved a charge by a seaman of improper discharge by the employer. The latter contended that the plaintiff seaman had disobeyed an order to steer the vessel properly. The U. S. Coast Guard had previously found the plaintiff guilty in connection with the same incident and had disciplined him. After investigation the plaintiff's union refused to arbitrate the grievance. Prior to litigation, because of the company's refusal to rehire him and the union's failure to prosecute his grievance, plaintiff had filed a series of charges with the National Labor Relations Board. Finding no basis to support plaintiff's claim of discriminatory treatment, no complaint was issued. The district court granted the defendant's motion for summary judgment, ruling that the papers which had been submitted demonstrated that the plaintiff was not discharged without cause, that the union did not act in bad faith and that plaintiff's charges of conspiracy and fraud were conclusory.

*Brandt, supra,* concerned a similar charge by a seaman of unfair discharge. After the union had investigated it concluded that the case lacked merit and refused to seek arbitration. The seaman sued both the employer and the union to compel them to arbitrate the propriety of his discharge. Summary judgment was granted in favor of the defendants since there were no facts alleged from which the court or jury could reasonably find that the union acted arbitrarily or in a discriminatory manner.

The vital point of distinction between *Maddox, Sipes, Freedman* and *Brandt* on the one hand, and the instant case on the other, is that here the plaintiff is seeking the judicial adjudication or enforcement of his rights created by a federal statute which applies solely to seamen and the payment of their wages.

In the case of Lakos v. Saliaris, 116 F.2d 440 (4 Cir. 1940), there is involved the interpretation and application of Title 46, U.S.C. § 597, which also pertains to the payment of seamen's wages. One of the questions presented was whether a "war bonus" to be paid in addition to basic wages constituted "wages" within the meaning of the statute. There it was held that the courts of the United States are required to assume jurisdiction of such a controversy arising under the statute.

The collective bargaining grievance procedure available to any seaman who is a union member to collect sums allegedly due him from his employer is an additional mode of redress for such seaman and which he may pursue, at his election. However, such procedure is of fairly recent vintage, having matured in viable form during the period when labor was making substantial gains on the economic front. Section 596 antedated by long years the grievance procedure provided in the union contract. To construe the grievance procedure as a mandatory substitute for the seaman's statutory right to prompt payment of his wages is, in our opinion, palpable error. Statutes enacted out of considerations of public policy, such as section 596 pertaining to seamen's wages, should not and cannot be nullified or circumvented by private agreement.

In our research of this question we discovered numerous cases in which the amounts involved were much less than the amounts claimed by the plaintiff in this case. We need not specifically cite these cases but, in passing, we are prompted to note them in light of the district court's expressed fear that it will be inundated with small claims of the type involved in the instant case.

The case will be reversed and remanded to the district court for further proceed-

ings consistent with the views herein expressed.

Reversed and remanded.

HAYNSWORTH, Chief Judge (dissenting):

I dissent.

The claims pressed by Arguelles are almost totally dependent upon an interpretation and application of the collective bargaining agreement between his labor union and his employer. Arguelles invokes that agreement; he is bound by it, including its requirement of resort to its grievance and arbitration procedures for the settlement of contract disputes. The majority forgoes the obvious advantages of having such claims adjudicated within the framework of that agreement because it perceives that the special protection traditionally accorded seamen with respect to prompt payment of wages as evidenced by 46 U.S.C.A. § 596 requires that wage claims be heard initially in a district court. I think the purpose of the statute unthwarted and the protection of seamen undiminished by enforcement of the contract's requirement of arbitration in which the seaman is represented by a union representative skilled in the interpretation of the collective bargaining agreement upon which the claim is based.

The statute upon which the plaintiff relies has a long history. Its forerunners[1] were enacted at a time when there was a not uncommon practice of discharging seamen in a foreign port without any money, rendering them easy prey to a shipowner desiring a lower wage scale. There were in those days no collective bargaining agreements to mitigate the harshness of the seaman's working conditions or to lend him protection at the time of discharge. The statute protected seamen "from the harsh consequences of arbitrary and unscrupulous action of their employers, to which, as a class, they are peculiarly exposed." Collie v. Fergusson, 281 U.S. 52, 55, 50 S.Ct. 189, 191, 74 L.Ed. 696 (1930).

The circumstances requiring protection of seamen from discharge in foreign ports without sufficient funds are now largely dissipated. Though the dissipation may have resulted, in large part, from the existence of the statute, collective bargaining agreements now bar the return of the harsh practices of the Eighteenth Century.[2] The collective bargaining agreement and the maritime union stand as protection to the seamen, guarding against overreaching by the employer. When a claim under the statute is wholly, or largely, dependent on an interpretation and application of the collective bargaining agreement, the purpose of the statute is not frustrated by resort to grievance procedures established between the employer and the union.

To be balanced against the purpose of the act providing for prompt payment of wages of seamen, 46 U.S.C.A. § 596, is the purpose of the federal labor laws. These laws "seek to promote industrial peace and the improvement of wages and working conditions by fostering a system of employee organization and collective bargaining." Vaca v. Sipes, 386 U.S. 171, 182, 87 S.Ct. 903, 912, 17 L.Ed.2d 842. When a claim is based on the terms of the collective bargaining agree-

---

1. Act of July 20, 1790, ch. 29, § 6, 1 Stat. 133; Act of June 7, 1872, ch. 322, § 35, 17 Stat. 269.

2. I do not mean to intimate that the statute has no continuing utility. Clearly the union and the employers could not, under the guise of the collective bargaining agreement, negate seamen's rights under the statute. Nor would I require resort to grievance procedures when a claim is based entirely upon the statute. *See,*

*e. g.,* Prindes v. S. S. African Pilgrim, 4 Cir., 266 F.2d 125 (wrongful withholding of amount admittedly due in order to secure release to claim for further wages). Suits under the statute should also be allowed when no other means to adjudicate the claim is clearly or readily available. *See, e. g.,* Gkiafis v. S. S. Yiosonas, 4 Cir., 387 F.2d 460 (claim of foreign seaman).

ment,[3] the Supreme Court, interpreting § 301(a) of the Labor Management Relations Act,[4] has required resort to the grievance processes under that agreement.[5]

> Since the employee's claim is based upon the breach of the collective bargaining agreement, he is bound by the terms of that agreement which govern the manner in which contractual rights may be enforced. For this reason, it is settled that the employee must at least attempt to exhaust exclusive grievance and arbitration procedures established by the bargaining agreement.
>
> Vaca v. Sipes, *supra* at 184, 87 S.Ct. at 914.

Mandatory use of grievance procedures is of great benefit both to the employer and to the union. And it cannot be said, "in the normal situation, that contract grievance procedures are inadequate to protect the interests of an aggrieved employee until the employee has attempted to implement the procedures and found them so. * * * If a grievance procedure cannot be made exclusive, it loses much of its desirability as a method of settlement. A rule creating such a situation 'would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements.'" Republic Steel Corp. v. Maddox, 379 U.S. 650, 653, 85 S.Ct. 614, 616, 13 L.Ed.2d 580.

I see nothing in the language or purpose of 46 U.S.C.A. § 596 which requires the disruption of collective bargaining agreements governing maritime claims contrary to the intention of Congress as expressed in § 301(a) of the Labor Management Relations Act.[6] I would require the use of union grievance and arbitration procedures in settling a seaman's claim when that claim is based on the collective bargaining agreement between his union and his employer, an agreement by which the employee is bound and which, properly interpreted, determines his rights.

---

3. The claim here is based almost entirely on the collective bargaining agreement. The overtime wage claim is dependent upon an interpretation of the agreement. The statutory claim under 46 U.S.C.A. § 596 requires an interpretation of the agreement to answer the question whether the ship was in port while anchored off Cap St. Jacques.

4. 29 U.S.C.A. § 185(a).

5. *See* TWUA v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972; General Electric Co. v. Local 205, UEA, 353 U.S. 547, 77 S.Ct. 921, I L.Ed.2d 1028; United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403; United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409; Republic Steel Corp. v. Maddox, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580; Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842. Not only is resort to arbitration required but courts should refuse to review the merits of an arbitration award. United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424.

