Harry J. RAMSEY, Plaintiff,

v.

M/V MODOCK and River Lines, Inc.,
Defendants.

Civ. A. No. 71–1910.

United States District Court,
E. D. Louisiana.

Feb. 18, 1974.

James A. Wysocki, Henry L. Klein, New Orleans, La., for plaintiff.

Robert A. Vosbein, New Orleans, La., Robert G. Partridge, San Francisco, Cal., for defendants.

Charles J. Pisano, New Orleans, La., for intervenor Charles J. Pisano.

ALVIN B. RUBIN, District Judge:

The plaintiff, who captained the M/V MODOCK during most of her maiden voyage from New Orleans to San Francisco sued the vessel and her owner River Lines, Inc. for the injuries and other damages he sustained when the crew of the vessel took command from him midway through the voyage. After three and one-half days of trial, the jury returned a verdict for the plaintiff on both a negligence count and an unseaworthiness count, awarding him $15,000 damages, $2,000 in wages due, and $379 for lost property. The defendant, River Lines, Inc., has now moved for judgment notwithstanding the verdict or, in the alternative, for a new trial on all issues. The plaintiff opposes these motions and asks that judgment for penalty wages be entered under 46 U.S.C. § 596 in accordance with the jury's finding by special interrogatory that the defendant withheld plaintiff's wages without sufficient cause.

*Penalty Wages*

Although it was adverted to at the pre-trial conference, the penalty wages issue was first joined when the parties, belatedly and after the time fixed by the court, submitted their proposed jury instructions. At that time, the parties' dispute focussed on Mr. Ramsey's status as a master: was he a master when the wages became due, and if so, could a master recover the statutory penalty? In a conference called during a brief recess, the court indicated that Mr. Ramsey's status was a matter for the court's determination, since there appeared to be no dispute about the material facts; the court also indicated a present disposition to enter a directed verdict against the plaintiff on this issue because of its

judgment about Mr. Ramsey's status and its reading of the statute. Later, and before the case went to the jury, the court informed counsel that it would, in order to complete the record, instruct the jury on the penalty wage issue and submit to it the question of defendant's conduct in withholding Mr. Ramsey's wages.

As a result, the court's instructions and the jury's findings on wages read as follows:

All members of a vessel's crew, including the master, are entitled to recover their wages for the entire voyage if they must leave the ship because they become disabled in its service or, because of the unjustified actions of the owner or his agents, they are unable to continue the voyage. If a member of the crew deserts, however, he is not entitled to recover these wages. A seaman deserts when he abandons his duty by quitting the ship before the termination of his engagement, without justification and with the intention of not returning.

In addition, the law provides for a penalty, fixed in the law, that an employer must pay a seaman a penalty when it refuses or neglects to make payment without sufficient cause within twenty-four hours of the end of the voyage. "Without sufficient cause" means arbitrarily or unreasonably or wilfully—that is without a reasonable cause.

17. Did Mr. Ramsey at any time during the voyage desert the M/V MODOCK?
YES_____ NO __X__ , Escaped *

If you answered question No. 17 "yes" you need not answer questions 18–20.

18. Does the defendant owe any wages to Mr. Ramsey, and if so, how much? And for what dates?
YES __X__ AMOUNT __$2,000.00__
NO_____ DATES __6/ – /70 to 7/ – /70__

19. Did the defendant fail to pay these wages arbitrarily, unreasonably, or wilfully?
YES __X__ NO_____

* The jury added the word "escaped" in pencil to their response

The court refused to give defendant's Proposed Charge No. 8: "Further, I

charge you that if the ship owner's failure to pay wages to the plaintiff was reasonable initially but later became unreasonable, the plaintiff is not entitled to the double wage penalty." The defendant cited only McCrea v. United States, 1935, 294 U.S. 23, 55 S.Ct. 291, 79 L.Ed. 735, as authority, and an examination of that case shows that this language is taken out of context and then oversimplified.

■ The court remains convinced that a directed verdict on these facts was appropriate, since under no construction of them would Mr. Ramsey be entitled to penalty wages. Under the penalty wage statute, 46 U.S.C. § 596, only seamen can claim the penalty; Mr. Ramsey was hired as a master, and he remained a master so long as he was performing services for the vessel.

It is true that under the Jones Act, as the Supreme Court first held in Warner v. Goltra, 1934, 293 U.S. 155, 55 S.Ct. 46, 79 L.Ed. 254, masters are considered to be "seamen" and they are therefore entitled to sue under the Act. But in *Warner* itself, the Court carefully distinguished the Jones Act definitions of master and seaman from the definitions applicable in wage claim cases:

> A goodly number [of statutes] give a remedy to seamen for wages wrongfully withheld, or define terms of payment that agreement may not vary. In respect of dealings of that order, the maritime law by inveterate tradition has made the ordinary seaman a member of a favored class. He is a "ward of the admiralty," often ignorant and helpless, and so in need of protection against himself as well as others. The master, on the other hand, is able in most instances to drive a bargain for himself, and then when the bargain is made, to stand upon his rights. Discrimination may thus be rational in respect of remedies for wages. 55 S.Ct. at 49.

Four years later the court held expressly that masters' wages were not protected by a related wage-protection statute, 46 U.S.C. § 601. The decision turned upon an interpretation of the very definitional section, 46 U.S.C. § 713, that gives content to the terms "master" and "seaman" in the penalty wage statute. Blackton v. Gordon, 1938, 303 U.S. 91, 58 S.Ct. 417, 82 L.Ed. 683.

Unless time has undercut their rationale or Congress has overridden them, these two decisions must govern Mr. Ramsey's claim. He argues quite forcefully and persuasively that both have occurred: masters now are often as powerless to protect their wages as seamen, and Congress recognized as much when it amended Title 46 in 1968 to give masters as well as seamen a lien on the vessel for unpaid wages. The court has examined the legislative history of this amendment and particularly Senate Report No. 1079, April 5, 1968 [To accompany H.R. 13301]; it seems principally to reflect a concern for the position of the master's wage claim in bankruptcy rather than a broad desire to "equalize" masters' and seamen's wage remedies. Moreover, what Congress chose *not* to do in expanding the wage protection scheme of Title 46 to include masters is as significant as what it chose *to* do. Congress was aware of modern conditions and the changed role of a master when it made these revisions, yet it did not extend the penalty wage remedy to masters. In these circumstances, its silence must speak eloquently to this court.

■ But, the plaintiff argues, even if a master is not entitled to penalty wages, Mr. Ramsey ceased to be a master when the crew took control of the vessel and he then "reverted" to seaman status. 46 U.S.C. § 713 does define a seaman as "every person (apprentices excepted) who shall be employed or engaged to serve in any capacity on board". The difficulty with plaintiff's argument, which rather tortures the statutory definitions, is that Mr. Ramsey was hired as a master and performed services for the vessel only in that capacity; after the episode off Acapulco, he performed no services

whatsoever. It may be that a master who relinquishes command and then serves for the rest of the voyage is entitled to the penalty—for whatever *seaman's* wages were withheld—but Mr. Ramsey did not do that. He was hired and he worked only as a master; if he was not a master, he was not "employed or engaged to serve in any capacity on board."

But even if the court is incorrect on this point, and Mr. Ramsey might recover the penalty—either because masters may recover it or because Mr. Ramsey became a seaman after the mutiny —a new trial would be required on this issue. As so often happens when major issues are left obscure until the eve— and in this case, past the eve—of trial, the instruction the jury received on the entire penalty wage issue was incorrect, for the issue is substantially more complex than counsel made it appear. The statute upon which Mr. Ramsey's claim for penalty wages rests, 46 U.S.C. § 596, reads:

> The master or owner of any vessel making coasting voyages shall pay to every seaman his wages within two days after the termination of the agreement under which he was shipped, or at the time such seaman is discharged, whichever first happens; and in case of vessels making foreign voyages, or from a port on the Atlantic to a port on the Pacific, or vice versa, within twenty-four hours after the cargo has been discharged, or within four days after the seaman has been discharged, whichever first happens; and in all cases the seaman shall be entitled to be paid at the time of his discharge on account of wages a sum equal to one-third part of the balance due him. Every master or owner who refuses or neglects to make payment in the manner hereinbefore mentioned without sufficient cause shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed beyond the respective periods, which sum shall be recoverable as wages in any

claim made before the court; but this section shall not apply to masters or owners of any vessel the seamen of which are entitled to share in the profits of the cruise or voyage. This section shall not apply to fishing or whaling vessels or yachts.

To support any recovery, the jury needed to decide as a preliminary matter whether Mr. Ramsey's discharge or the ship's discharge of cargo occurred first, in order to determine whether the twenty-four hour or the four day period should apply. Then the jury had to determine that River Lines failure to pay wages *within the applicable period* was without sufficient cause *during that same period; McCrea* holds that an owner's behavior, even if it later became arbitrary or unreasonable, does not make him liable for a penalty if sufficient cause to withhold wages was present during the statutory period.

Moreover, there is a substantial body of case law holding that the statutory penalty is not to be automatically computed and assessed by the court even if the defendant is liable; the court has some discretion over the amount. See, e. g., Southern Cross Steamship Co. v. Firipis, 4 Cir. 1960, 285 F.2d 651, and cases cited therein; Kontos v. S.S. SOPHIE C., E.D.Pa.1964, 236 F.Supp. 664. What was once a matter for the court in the exercise of its equitable discretion has presumably become, at least since Fitzgerald v. United States Lines Co., 1963, 374 U.S. 16, 83 S.Ct. 1646, 10 L. Ed.2d 720, a matter for the jury, since the claim for penalty wages is made in a complaint that includes a Jones Act claim. Thus the jury should have been instructed that, even if they found a penalty due, they might toll the period during which it was to run for reasons of equity.

The court's instructions to the jury on the penalty wage issue were thus both incomplete and incorrect. Even if the court incorrectly directed a verdict because of an erroneous reading of the penalty wage statute, the jury's

verdict could not support a judgment for penalty wages. The jury simply did not have an opportunity to pass upon the claim and all its elements because it was framed improperly. It may be, as the plaintiff argues, that there was some evidence of unreasonable and arbitrary failure to pay wages within the statutory period, perhaps even enough to support a jury verdict for the plaintiff on this issue; but it is certain that the jury never had an opportunity properly to deliberate, and this court will neither attempt to divine what result this jury would have reached nor decide the issue on its own.

Even if the error in instructions had been corrected at the last minute, and the question correctly put to the jury, a new trial might still be required on this issue. The plaintiff presented a great deal of evidence about conversations and correspondence between the parties and their attorneys at times subsequent to the four day period; plaintiff's attorney examined Mrs. Ramsey at some length in a particularly emotional scene about her visit to River Lines' office in an attempt to get her husband's wages, a visit she made long after the statutory period had run. Whatever the effect of this evidence on the other issues—and more remains to be said about that—and whatever weight it might have been given by a properly instructed jury with respect to tolling the penalty award, this testimony, admitted without any limiting instruction, infected the jury's consideration of the penalty wage issue. Much if not all of it should have been either excluded or admitted only for a limited purpose, since the only proper issues were (a) whether the defendant had reasonable grounds during the statutory period to refuse payment; and (b) if not, and if the penalty was due, whether it would run for the entire period of time from that time until paid.

Plaintiff's motion for judgment notwithstanding the court's directed verdict on the penalty wage issue is denied.

*Unseaworthiness*

The jury evidently decided that the M/V *MODOCK* was unseaworthy because, in the language of the instruction, it found that "each crew member or the crew members as a whole either lacked competency or had a wicked disposition, a propensity to evil conduct, or a savage and vicious nature." The evidence upon which they reached this conclusion conflicted.

The plaintiff's story, in essence, was that the crew early in the voyage began to subvert him because they were unaccustomed to deep water voyages, afraid of sailing too far from shore, and mistrustful of him. When he was off watch and asleep, the crew members on duty would alter the ship's course to bring it closer to shore; the First Mate, Mr. Mastrup, was particularly responsible for these maneuvers, Mr. Ramsey felt. Finally, the plaintiff was forced to arrest Mr. Mastrup and confine him to the forward hold. The crew, however, freed the First Mate and subdued Mr. Ramsey, keeping him confined until the ship docked in Acapulco, where the matter was handed over to the Mexican police. While the ship was in Acapulco, Mr. Ramsey managed to escape, and he then made his way back to the United States.

The only evidence to support Mr. Ramsey's version of these events, and in particular his claim that the nature of the crew made the vessel unseaworthy, is his own testimony, the bare fact of the alleged mutiny or removal of Mr. Ramsey from command, and the admitted fact that several members of the crew had never sailed outside of the San Francisco harbor.

The defendant's version is simply that Captain Ramsey, not the crew, was incompetent, and that the takeover by the crew was the result of his incompetence and not their disposition. To support its version of the incident, the defendant offered the testimony of four crew members at trial, the depositions of three

others, and the testimony of Mr. Beers, River Lines' President.

The jury evidently believed Mr. Ramsey's version of the mutiny, and their conclusion is of course entitled to great weight. Certainly their decision is supported by enough evidence to withstand a motion for judgment notwithstanding the verdict. Mr. Ramsey's testimony was "substantial evidence," in the sense that, after hearing it, "fair-minded men in the exercise of impartial judgment might reach different conclusions." Boeing v. Shipman, 5 Cir. 1969, 411 F. 2d 365. With his testimony there was not "a complete absence of probative facts to support the conclusion reached" by the jury. Fare v. Southern Railway Co., 5 Cir. 1971, 438 F.2d 933.

But if the court's function in deciding a motion for judgment notwithstanding the verdict is to look for substantial evidence, its role in considering a motion for a new trial, brought on the grounds that the verdict is against the weight of the evidence, is quite different. As Moore puts it:

> The trial judge, exercising a mature judicial discretion, should view the verdict in the overall setting of the trial; consider the character of the evidence and the complexity or simplicity of the legal principles which the jury was bound to apply to the facts; and abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result. The judge's duty is essentially to see that there is no miscarriage of justice. If convinced that there has been then it is his duty to set the verdict aside; otherwise not. 6A Moore's Federal Practice ¶ 59.08 [5] at p. 59–161.

An independent evaluation of the evidence in this case has convinced the court that the jury did in fact reach a seriously erroneous result and that the interests of justice would best be served by granting a new trial.

The court found Captain Ramsey's testimony unpersuasive. Evidence as to his background and character introduced by the plaintiffs and never rebutted—his use of several names and social security numbers, the confusion surrounding whether he ever had a master's license, his lack of actual experience as a master—tended to cast some doubt on his testimony in general. His inability to plot an accurate course in response to navigational situations put to him while he was on the witness stand because, among other reasons, he failed to take wind-drift into account suggests that it was his incompetence and not the crew's disobedience that put the ship off course. His continuing confusion as to the meaning of standard nautical terms during his testimony reinforces this conclusion. Testimony from the crew about his behavior during the voyage and his own inability to explain conflicts between his testimony at trial and log entries next to his initials also undermine the credibility of his version of events. Finally, the intangible factors of mien and manner during testimony lead the court to doubt Captain Ramsey's story.

The only other evidence tending to indicate that the crew was incompetent, and the vessel thus unseaworthy, was the testimony that most of the crew had not sailed on deep water before, and the fact that the crew did remove Mr. Ramsey from command. While a jury might draw inferences from evidence like this in other cases, the court is convinced that the inference evidently drawn here—that the crew was incompetent—is unwarranted.

Mr. Ramsey's testimony contrasted sharply with the testimony of the MODOCK's crew members and Mr. Beers, both in content and indicia of credibility. Counsel for the plaintiff made much of the fact that the crew members' stories coincided, suggesting that this indicated agreement to cover up the real facts. From listening to the testimony and watching these witnesses as they testified, the court is convinced that accurate memories and truthful narration are a far more probable explanation for this "coincidence" than the conspiracy

theory plaintiff's counsel suggested. The jury failed to give the testimony of these crew members the weight it deserved.

It should be noted, too, that all of the irrelevant evidence admitted on the issue of penalty wages, emotional and inflammatory as some of it was, may have warped the jury's consideration of the unseaworthiness issue. This possibility has not influenced the court's independent evaluation of the evidence on unseaworthiness; it may, however, provide some explanation for the jury's verdict.

In light of all the evidence adduced at trial, then, the court finds that the jury's verdict on the issue of unseaworthiness is so seriously in error that a new trial is necessary.

*Negligence*

■■ In order to recover for negligence in a case like this, the plaintiff must show exactly what he must show to recover for unseaworthiness—that the crew was incompetent, or vicious, or inclined to mutiny. Thus the evidence upon which the jury found the plaintiff negligent was just as weak as the evidence supporting the unseaworthiness verdict, and a new trial must be granted as to this count for the same reasons. In addition, to support a negligence recovery, the plaintiff must show that the defendant knew or should have known of the crew's incompetence or other unfitness for the voyage. See Thompson v. Coastal Oil Co., D.N.J.1954, 119 F.Supp. 838. The evidence supporting this element of the claim was, if anything, weaker than the evidence going to the crew's nature; at most the plaintiff proved a failure to investigate each crew member individually.

The power of a trial judge to grant a new trial originates in the common law; the Constitution specifically preserved it, and the Federal Rules of Civil Procedure recognize it. Nonetheless, it is not a power that any judge does or should exercise lightly. But in this case, in view of the court's firm conviction that

the jury verdict in finding the vessel unseaworthy and the defendant negligent under the evidence presented to it resulted in a miscarriage of justice, the defendant's motion for a new trial as to these issues is granted.