**Captain Harold SMITH, et al.**

v.

**WESTERN OFFSHORE, INC., et al.**

**Civ. A. No. 82–0266.**

United States District Court,
E.D. Louisiana.

June 26, 1984.

---

Thomas L. Smith, New Orleans, La., for plaintiffs.

James I. Wheeler, Metairie, La., for Western Offshore, Cheyenne Boat.

## OPINION

ARCENEAUX, District Judge.

Plaintiffs in this matter, Harold Smith,[1] Norman Rack and Edward Walgamatte, served as seamen aboard the M/V RIG TENDER II in August and September of 1981. Despite their persistent demands, they have not been paid their wages. Consequently, they brought this seamen's wage action under the general maritime law and 46 U.S.C. § 561 *et seq.*[2] against their employer, Western Offshore, Inc.; the owner and president of Western, Gene Balsom; the vessel upon which they served, the M/V RIG TENDER II; and the owner of the RIG TENDER II, the Cheyenne Boat Company. The case was tried to the Court without a jury on September 1, 1983 and was taken under submission. The Court now issues its opinion in which it finds that plaintiffs are owed back wages and double wage penalties from their employer, Western. However, plaintiffs are entitled to nothing from any of the other defendants. Judgment will be entered accordingly.

## FACTS

At all relevant times, plaintiffs were Louisiana residents. Western Offshore was a

---

1. Captain Smith died in January of 1983. His brother, Earl Smith, was substituted as party plaintiff on September 1, 1983.

2. 46 U.S.C. § 561 *et seq.,* pertaining to wages of seamen, was repealed by Act of Congress on August 26, 1983. Pub.L. 98–89, § 4(b), August 26, 1983, 97 Stat. 600–602. It was replaced by 46 U.S.C. §§ 10301 through 10509, August 26, 1983, P.L. 98–89, § 1, 97 Stat. 561–572. Though the differences between the two statutory schemes are more than matters of form, insofar as this case is concerned, they are identical. The Court will refer to the former statutory scheme because it was still in effect when plaintiffs' claims arose.

Louisiana corporation engaged in the business of chartering boats which supplied products and services to oil platforms in the Gulf of Mexico. Western Offshore operated from a dock in Larose, Louisiana. Its president and owner was Gene Balsom, a resident of California. Its daily affairs were managed by port captain Victor Harbord, who is also an engineer and ship repair mechanic. Cheyenne Boat Company was a Louisiana corporation and the owner of the RIG TENDER II. The RIG TENDER II was a small, steel 63-foot utility vessel equipped with radio and radar, and served mostly as a standby vessel in the oil fields. The RIG TENDER II had been under charter to Western Offshore since 1981.

In the summer of 1981, Western Offshore had an assignment for the RIG TENDER II in the port of Los Angeles, California. Consequently, on August 3, 1981, Balsom hired three men—Harold Smith, Norman Rack and Robert Joley—to navigate the vessel from Larose to Los Angeles. Balsom engaged Smith to captain the RIG TENDER II, and promised to pay him $80.00 per day for the length of the voyage. Balsom hired Rack to serve as navigator, and promised to pay him also $80.00 per day. Joley was hired as a deckhand, though the terms of his employment are unknown. The vessel sailed the same day.

During the voyage, the RIG TENDER II experienced various mechanical problems which necessitated several stops and considerably lengthened the trip. For example, during the first leg of the trip, the starboard engine developed a cracked head, which forced the vessel to put in at Isla Mujeres, Mexico. Victor Harbord, Western's ship repair mechanic, flew to Isla Mujeres to meet the vessel in order to effect the necessary repairs, and then flew back to Larose. At this point, because of a personality conflict, Joley left the vessel and flew back to the United States. On August 12, 1981, Balsom hired Walgamatte to replace Joley, promised to pay him $45.00 per day, and flew Walgamatte to Cancun where the vessel had made its sec-

ond stop. The RIG TENDER II then set out again, but developed cracks in both heads of the port engine, which forced the vessel to put in at the Panama Canal. Harbord again flew down to meet the vessel to make the necessary repairs. On August 18, 1981, while at the Panama Canal, Harbord gave Smith and Rack $500.00 each and Walgamatte $200.00 as advances on their wages. Again the vessel set out, but this time it was forced to stop in Acajutla, El Salvador, because the lubricating system of the starboard engine had sprung an oil leak. Harbord then met the vessel for the third time to repair the lubricating system. On September 15, 1981, while the vessel was stopped in Acapulco, the navigator, Rack, left the service of the RIG TENDER II because of personal difficulties he had had with Captain Smith. Western Offshore gave Rack a plane ticket so he could return home. Though he demanded his wages, Rack was not paid. Smith hired several Mexican sailors to replace Rack, and again the vessel sailed. On September 22, 1981, because of further mechanical difficulties, the vessel put in at Puerto Vallerta. Harbord flew out to the vessel with a new crew, and fired Smith and Walgamatte. The captain and deckhand were given airplane tickets in order to return home, but, though they demanded their wages, they were not paid. The vessel continued to Los Angeles with the new crew.

Upon their return to the United States, Smith, Rack and Walgamatte called on the Larose office of Western Offshore to obtain payment of their wages. The port captain, Harbord, refused to pay them. The seamen then placed calls to Balsom's office in California, also to no avail. This suit followed.

## LAW

1. *Preliminary Procedural Matters*

■ A suit for seaman's wages is properly before a district court under its maritime jurisdiction. *U.S. Bulk Carriers, Inc. v. Arguelles*, 400 U.S. 351, 353, 91 S.Ct.

409, 410, 27 L.Ed.2d 456 (1971). Thus, the Court has subject matter jurisdiction over this case under 28 U.S.C. § 1333. Venue is proper here since the claim arose in the Eastern District of Louisiana.

Plaintiffs brought suit against Western Offshore, Cheyenne Boat and Gene Balsom *in personam,* and against the RIG TENDER II *in rem.* The Court has *in personam* jurisdiction over Western Offshore and Cheyenne Boat since, at all relevant times, both defendants were Louisiana corporations.

■ However, the Court never gained *in personam* jurisdiction over Gene Balsom. Plaintiffs attempted to join Balsom as a defendant in their supplemental and amending complaint. However, this document was served on Balsom through Victor Harbord, port captain, at the Western Offshore office in Larose. See "process receipt and return", Record, doc. no. 27. Service upon an individual through a nonauthorized agent for service of process at the individual's place of business is not a proper means of serving process under the Federal Rules of Civil Procedure. See Fed.R. Civ.P. 4(d)(1).[3] Rule 4(d)(1) contemplates three means of serving an individual: personal service, domiciliary service and service upon an authorized agent. Here, it is clear that Balsom was not served personally, nor were copies of the summons and complaint left at his home. Plaintiffs attempted to serve Balsom through Victor Harbord at the office of Western Offshore in Larose. Service delivered to an individual's place of business does not confer *in personam* jurisdiction over that person. Fed.R.Civ.P. 4(d)(1). Moreover, there is no evidence that Victor Harbord was Balsom's authorized agent for service of process. Thus, the Court never gained *in personam* jurisdiction over Gene Balsom.

■ Nor did the Court gain jurisdiction over the RIG TENDER II. As mentioned above, plaintiffs sued the vessel *in rem* to execute their maritime lien for unpaid wages. A proceeding *in rem* is against the vessel itself, and can only be commenced in the judicial district in which the vessel is, or is soon expected to be, found. *The Belgenland,* 114 U.S. 355, 5 S.Ct. 860, 29 L.Ed. 152 (1885); see also Fed.R.Civ.P.Supp. C(2). Admiralty *in rem* proceedings contemplate the arrest of the res. Fed.R.Civ.P.Supp. C(3), C(2). "In American jurisprudence, arrest of the res is a jurisdictional prerequisite and not simply a procedural device for obtaining jurisdiction." 7A Moore's Federal Practice ¶ C.02 n. 2 (2d ed. 1983). In the absence of an arrest of the res, a decree *in rem* cannot be rendered against the res. *Dow Chemical Co. v. Barge UM-23B,* 424 F.2d 307, 311 (5th Cir.1970). Here, the marshall never arrested the RIG TENDER II. Thus, the Court never gained *in rem* jurisdiction over the vessel. Only Western Offshore and Cheyenne Boat are properly before the Court.

## 2. Right to Wages

### a. Who must pay?

■ "[The seaman's right to wages] arises out of the contract of employment. Wages are the quintessential obligation of an employer to his employee.... [Thus], wages remain the particular responsibility of the employer." *Baker v. Raymond International, Inc.,* 656 F.2d 173, 185 (5th Cir.), *cert. denied,* 456 U.S. 983, 102 S.Ct. 2256, 72 L.Ed.2d 861 (1982). Western Offshore, through its president, Gene Balsom, engaged the plaintiffs to navigate the RIG TENDER II from Larose, Louisiana to Los Angeles, California, and promised to pay them modest sums for their work. None of the plaintiff's signed shipping articles. The agreement was oral. Unfortunately,

**3.** Fed.R.Civ.P. 4(d)(1) provides, in pertinent part: "Service shall be made as follows: (1) Upon an individual other than an infant or incompetent person, by delivering a copy of the summons and of the complaint to him personally or by leaving copies thereof at his dwelling house or usual place of abode with some person of suitable age and discretion then residing therein or by delivering a copy of the summons and of the complaint to an agent authorized by appointment or by law to receive service or process."

plaintiffs' tenure ended prematurely when, en route to Los Angeles, they were fired. However, as employer of the plaintiffs, Western Offshore must shoulder the responsibility of accounting for their unpaid wages.

■ Under certain circumstances not involved herein, the vessel owner may be liable for the seaman's wages. 1 Norris, The Law of Seamen § 299 (3d ed. 1970). However, "[n]either policy nor precedent permits a seaman to sue a nonemploying owner *in personam* for .... wages." *Baker, supra* at 185. Cheyenne Boat was the owner of the RIG TENDER II, and chartered the vessel to Western Offshore. Cheyenne Boat did not deal with the plaintiffs. They were hired by and served Western Offshore, not Cheyenne Boat. When the RIG TENDER II encountered mechanical difficulties en route to Los Angeles, Victor Harbord, an employee of Western Offshore, and not of Cheyenne Boat, attended to the vessel. After their discharge without pay, plaintiffs sought their wages from Balsom at the Western Offshore office in Larose. Thus, plaintiff's employer was Western Offshore, and not Cheyenne Boat. Because, as stated above, a seaman may not sue a nonemploying vessel owner *in personam* for unpaid wages, Cheyenne Boat has no obligation to pay plaintiffs their unpaid wages.

b. *When the Right Vests*

■ A seaman's right to wages vests when he commences work aboard the vessel, unless the shipping articles specify an earlier time. 46 U.S.C. § 596.[4] Plaintiffs did not sign shipping articles. Thus, plaintiffs' right to wages vested when they entered into the service of the RIG TENDER II. For Harold Smith and Norman Rack, that date was August 3, 1981. For Edward Walgamatte, that date was August 12, 1981.

c. *The Impermissibility of Advances*

■ The payment of unearned advance wages to the seaman is void, and does not diminish the employer's obligation to fully pay earned wages. 46 U.S.C. § 599(a).[5] However, certain payments of wages already earned are permissible, and ratably reduce the employer's indebtedness. See 46 U.S.C. § 597; *Rallatos v. Greek S.S. Matrozos*, 240 F.Supp. 342, 344 (E.D.Va.1964). The critical question is whether, when the alleged advance was made, the seaman had already begun to earn wages. Here, Western Offshore promised, in exchange for their services aboard the RIG TENDER II, to pay plaintiffs a certain sum per day. That sum, in the cases of Harold Smith and Norman Rack, was $80.00 per day. In the case of Edward Walgamatte, that sum was $45.00 per day. Thus, plaintiffs earned their wages on a day-by-day basis. On August 18, 1981, while the RIG TENDER II was held over in the Panama Canal, Smith and Rack were paid $500.00 each, and Walgamatte was paid $200.00. At that time, Smith and Rack had served fifteen days aboard the RIG TENDER II, and had earned $1,200.00 each. Walgamatte had served three days, and had earned $270.00. Plaintiffs' earnings thus exceeded the amounts they were paid on August 18, 1981. The August 18, 1981 disbursements were payments of wages already earned, and not advancements on wages yet to accrue. The payments were not "advances" which, under 46 U.S.C. § 599(a), are void and do not diminish the employer's obligation to fully pay earned wages. Instead, the payments satisfied wages which had already been earned. The payments were therefore permissible, and ratably re-

---

**4.** Section 596 states, in pertinent part:
  "The master or owner of any vessel making coasting voyages shall pay to every seaman his wages within two days after the termination of the agreement under which he has shipped, or at the time such seaman is discharged, whichever first happens...."

**5.** Section 599(a) provides, in pertinent part:
  "It shall be unlawful in any case to pay any seaman wages in advance of the time when he has actually earned the same...."

duced the obligation of Western Offshore to pay plaintiffs' wages. See *Rallatos, supra* at 344.

### d. Amounts Owed in Wages

The master of a vessel which makes a coastwise voyage must pay each seaman his wages within two days after the shipping agreement is terminated or at the time the seaman is discharged, whichever is earlier. 46 U.S.C. § 596. Plaintiffs signed no shipping articles. On September 15, 1981, Rack was discharged, after serving 44 days aboard the RIG TENDER II. During that period, he earned $3,520.00 in wages. He had been paid $500.00 on August 18, 1981. Thus, upon his discharge, Rack was entitled to $3,020.00 in wages. On September 22, 1981, Smith and Walgamatte were discharged. Smith had served 51 days aboard the RIG TENDER II. During that period, he earned $4,080.00 in wages. He had been paid $500.00 on August 18, 1981. Thus, upon his discharge, Smith was entitled to $3,580.00 in wages. Walgamatte had served 42 days aboard the RIG TENDER II. He had earned $1,680.00 in wages. He had been paid $200.00 on September 18, 1981. Upon his discharge, he was entitled to $1,480.00 in wages.

### e. Airline Tickets as Partial Payments in Kind

■ After discharging plaintiffs, Western Offshore supplied the seamen with airplane tickets to return to the United States. Under certain circumstances, the master's purchase and seaman's receipt of an airline ticket constitutes partial payment in kind of wages. See *American Foreign SS Co. v. Matise*, 423 U.S. 150, 96 S.Ct. 410, 46 L.Ed.2d 354 (1975). Such a transaction, of course, would ratably diminish the employer's obligation to pay the seaman's wages. Had the Court received evidence concerning the price of the airline

tickets, it would be obligated to consider their value in determining the wages owed plaintiffs. However, the Court received no such evidence. Therefore, it has no way to calculate the benefit conferred on the plaintiffs by their receipt of the airline tickets. Accordingly, the tickets do not diminish Western Offshore's obligation to pay plaintiffs' wages.

### f. Double Wage Penalties

■ An employer who, without sufficient cause, refuses or neglects to make wage payments must pay the seaman two days' pay for every day payment is delayed beyond the prescribed period. 46 U.S.C. § 596.[6] The phrase "without sufficient cause" means more than the absence of a valid defense to the claim for wages; the double wage penalty is assessed only when the delay is arbitrary or unreasonable. *McCrea v. United States*, 294 U.S. 23, 30, 55 S.Ct. 291, 294, 79 L.Ed. 735 (1935); *Collie v. Ferguson*, 281 U.S. 52, 55, 50 S.Ct. 189, 191, 74 L.Ed. 696 (1930). However, once the seaman establishes delay in the payment of wages, the burden of proof falls upon the master to show that the delay was justified. *Arguelles v. U.S. Bulk Carriers, Inc.*, 408 F.2d 1065 at 1070. The penalty period begins to run upon demand. 1 Norris, The Law of Seamen § 416 (3d. Ed.1970).

■ Western Offshore was obligated to pay plaintiffs the balance of the wages due them upon their discharge. 46 U.S.C. § 596. Plaintiffs demanded their wages from Western Offshore when they were discharged and after they returned to the United States. Western Offshore steadfastly has refused to pay. Plaintiffs clearly have established delay in payment beyond the date of their discharge. The burden of proof then falls upon Western Offshore to show that the delay was justified. *Arguelles, supra.* Western Off-

---

**6.** The relevant portion of Section 596 provides: "Every master or owner who refuses or neglects to make payment in the manner hereinbefore mentioned without sufficient cause shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed beyond the respective periods, which sum shall be recoverable as wages in any claim made before the Court...."

shore introduced no evidence justifying the delay in payment. Indeed, Western Offshore introduced no evidence at all. Therefore, it wholly failed to carry its burden of proving that the nonpayment of wages was justified. The Court, therefore, finds that Western Offshore refused to pay plaintiffs' wages without sufficient cause. Accordingly, plaintiffs are entitled to two days pay for every day payment was refused beyond the date they were discharged.

Rack was discharged on September 15, 1981, at which time, as to him, the double wage penalty period began to run. He is owed $160.00 per day for every day since then, up until the date he is paid. Smith and Walgamatte were discharged on September 22, 1981, at which time, as to them, the double wage penalty period began to run. Smith is owed $160.00 per day, and Walgamatte $90.00 per day, for every day since then, up until the date they are paid. Since none of the plaintiffs have yet been paid, the penalty period continues to run.

3. *Prejudgment Interest*

The general rule in admiralty cases is that prejudgment interest should be awarded absent peculiar circumstances. See, e.g., *Dow Chemical Co. v. M/V Gulf Seas*, 593 F.2d 613, 614, (5th Cir.1979); *Socony Mobil Oil Co. v. Texas Coastal and International, Inc.*, 559 F.2d 1008, 1014 (5th Cir.1977). Prejudgment interest is appropriate in breach of contract actions. *International Paint Co., Inc. v. M/V Mission Viking*, 637 F.2d 382 (5th Cir.1981). Plaintiffs are entitled to prejudgment interest on their awards for unpaid wages and double wage penalty. Interest shall be calculated separately for the two awards. As to the award for unpaid wages, interest shall be calculated on the total lump unpaid sum, which, for Harold Smith is $3,580.00, for Norman Rack is $3,020.00, and for Edward Walgamatte is $1,480.00, at a rate of 12%. As to the award for the double wage penalties, the amount of which is uncertain, interest shall not be calculated on a lump sum, but at a daily rate, as the sums accrue, of 12%, from the date of demand.