**W. Kendall GEORGE, et al.**

v.

**KRAMO LIMITED, et al.**

Civ. A. No. 90–2483.

United States District Court,
E.D. Louisiana.

June 18, 1992.

Jerry Bythel Read, Paul T. Benton, Biloxi, Miss., James Thomas Dulin, Jr., Gulfport, Miss., for plaintiffs.

John Frederick Kessenich, Michael G. Helm, Emmett, Cobb, Waits & Kessenich, William Alexander Porteous, III, Porteous, Hainkel, Johnson & Sarpy, William B. Gibbens, III, Gelpi, Sullivan, Carroll & Laborde, Richard M. Perles, Faris, Ellis, Cutrone & Gilmore, New Orleans, La., for defendants.

### MEMORANDUM AND ORDER

SEAR, Chief Judge.

### BACKGROUND

Plaintiffs were employed as crew members of a vessel on a voyage from Houma, Louisiana to Seattle, Washington. During the voyage, the vessel sustained a fire in her engine room and was disabled. The vessel was towed to the Panama Canal where she was seized and later sold. Plaintiffs were discharged from their employment, but were not paid their wages for over one year. Plaintiffs seek to recover penalty wages from the vessel owner for the delay in payment of their wages. They have sued Kramo Limited (UK) and Kramo Transportation, Inc. At the pretrial conference, counsel conceded that there were no disputes of fact and that the sole questions were whether the Seaman's Penalty Wage Statute ("Statute")[1], under which plaintiffs have sued, applies to this voyage and, if so, who is liable for the payment of penalty wages. Accordingly, the parties filed joint stipulations of fact and cross-motions for summary judgment.

### ANALYSIS

I. *Does the statute apply?*

■ The parties have stipulated that the vessel, which weighed more than 75 gross tons,[2] departed Houma, Louisiana on a voyage bound for the State of Washington via the Panama Canal.[3] No intermediate stops other than that necessary to transit the Panama Canal were scheduled as part of the voyage.[4] The voyage ended at the Panama Canal because a fire disabled the vessel and it was seized for nonpayment of debt.[5] The Statute applies only to voyages between a port in the United States and a port in a foreign country *or* to vessels of at least 75 gross tons on a voyage between a port of the United States on the Atlantic Ocean and a port of the United States on the Pacific Ocean.[6] Plaintiffs contend that the Statute applies to the voyage in question under either provision. The Statute's application under § 10301(a)(1) turns on whether the transit of the Panama Canal should be considered a port of call. The Statute's application under § 10301(a)(2) turns on whether a port on the Gulf of Mexico should be considered to be a port on the Atlantic Ocean. The Statute applies to this voyage if either provision applies.

The voyage clearly was intended to be one from Houma, Louisiana to Seattle, Washington. The only scheduled ports for the vessel were Houma and Seattle but it was necessary for the vessel to transit the Panama Canal in a foreign country, the Republic of Panama. Plaintiffs contend that the transit of the Canal should be considered a call in a foreign port because the vessel was required to stop in Christobal, Republic of Panama in order to clear customs. Plaintiffs argue that the voyage, therefore, was a voyage between a port in

---

1. 46 U.S.C. § 10313.

2. Agreed stipulation 1.

3. Stipulations w, z.

4. Stipulation z.

5. Stipulations x, y.

6. 46 U.S.C. § 10301(a)(1) & (2).

the United States (Houma, Louisiana) and a port in a foreign country (Christobal, Republic of Panama). Defendants argue that the voyage was between Houma and Seattle, both ports of the United States. That the voyage included a transit of the Canal, defendants argue, did not make the voyage one from a port in the United States to one in a foreign country.

Plaintiffs have produced the affidavit of George Markham, a member of the Panama Canal Commission, Canal Operations Unit. Mr. Markham states that in order for the vessel to make its first time transit of the Canal, the vessel would be required to put into the port of Christobal, and make fast to the mooring buoy in the harbor to be inspected and admeasured for purposes of determining what tolls it must pay in order to pass through the canal.[7] Regardless, I find that such a stop does not convert a voyage between two ports in the United States into a voyage between a port in the United States and a port in a foreign country, within the meaning of 46 U.S.C. § 10301. In fact, had the vessel transited the Canal before, the stop at Christobal would not have been required at all. The distinction for whether the statute applies should lie in the nature of the voyage, not in whether a regulatory stop is required. In the alternative, plaintiffs argue that the voyage was one between a port of the United States on the Atlantic Ocean and a port of the United States on the Pacific Ocean. Plaintiffs contend that the Gulf of Mexico, on which Houma, Louisiana is located, is part of the Atlantic Ocean.

The Random House College Dictionary defines "gulf" as "a portion of an ocean or sea partly enclosed by land." The American College Dictionary defines "Gulf of Mexico" as "an arm of the Atlantic between the United States, Cuba and Mexico." The United States Supreme Court, in

*Merchants' Mutual Ins. Co. v. Allen,* [8] affirmed the Circuit Court of the United States for the Eastern District of Louisiana in finding that an insurance policy covering a ship in the Atlantic trade included activities in the Gulf of Mexico. In *Allen,* a vessel whose voyages were between New Orleans and Liverpool, England, was wrecked in the Gulf of Mexico. The issue was whether the insurance policy, which covered the vessel during its Atlantic trade, covered the vessel while in the Gulf of Mexico. The Court looked at the purpose of the insurance policy, the contemplation of the parties, and the exclusions of the policy and held that it was intended that the policy cover activities in the Gulf of Mexico.

*Allen* was later cited in the Department of Transportation, Coast Guard Law Bulletin, No. 429 at 16–17 (March 1982) as support for the Coast Guard's interpretation of 46 U.S.C. § 564 [9] that the Atlantic Ocean includes the Gulf of Mexico. The Coast Guard was faced with the issue of whether a penalty for shipping a crew without an agreement could be levied against a ship that had departed from Corpus Christi, Texas. The language of § 564 regarding applicable ports was identical to § 10303 and provided for the penalty for voyages from a port on the Atlantic to a port on the Pacific. The Coast Guard found that "port on the Atlantic" must be read in the overall context of the statute and the purposes for which it was enacted and held that Corpus Christi was such a port.

The Coast Guard first noted a previous Fifth Circuit case [10] in which the applicable statute referred to the Eastern Coast, a term that obviously excluded the Southern and Western Coasts, and so would have excluded a port such as Corpus Christi. The Coast Guard found it significant that § 564 made no East Coast/Southern Coast distinction, but referred only to Atlantic

---

7. Plaintiffs' exhibit A.

8. 121 U.S. 67, 7 S.Ct. 821, 30 L.Ed. 858, *reh'g denied,* 122 U.S. 376, 7 S.Ct. 1248, 30 L.Ed. 1209 (1887).

9. 46 U.S.C. § 564 and § 596 subsequently became 46 U.S.C. § 10301 and § 10313. 46 U.S.C. § 561, *et seq.* pertaining to wages of seamen,

was repealed by Act of Congress on August 26, 1983. Pub.L. 98–89, § 4(b), August 26, 1983, 97 Stat. 600–602. It was replaced by 46 U.S.C. §§ 10301 through 10509, August 26, 1983, P.L. 98–89, § 1, 97 Stat. 561–572.

10. *Bernuth, Lembecke Co. v. Sergeant,* 217 F.2d 704 (5th Cir.1955).

and Pacific ports. The Coast Guard then analyzed § 564 and found that because the statute's goal was protection, and because it specifically contained only certain exclusions, it intended a broad reading. Therefore, the Coast Guard held that "port on the Atlantic" must include ports on the Gulf of Mexico.

No other cases could be found addressing whether the Atlantic Ocean, as used in the applicable Statute, includes the Gulf of Mexico. What little is available favors finding that it does. The Statute could have excluded ports on the Gulf of Mexico, but it did not. It is not straining the Statute's intent, nor its wording, to find that a port on the Atlantic would include a port on the Gulf of Mexico. The legislative intent of the Statute and its precursors was "to protect [seamen] from the harsh consequences of arbitrary and unscrupulous actions[s] of their employers." [11] Because the nature of the statute is remedial, it should be read as broadly as possible. Because Houma is located on the Gulf of Mexico, a voyage from Houma, Louisiana to Seattle, Washington is covered by 46 U.S.C. § 10301. 46 U.S.C. § 10313(f) provides for the payment of wages at the end of such a voyage. 46 U.S.C. § 10313(g) provides:

> When payment is not made as provided under subsection (f) of this section *without sufficient cause*, the master or *owner* shall pay to the seaman 2 days' wages for each day payment is delayed.

The vessel left Houma on January 4, 1990 and was seized in Panama for nonpayment of debts on February 14, 1990.[12] Plaintiffs were not paid their wages until March 16, 1991.[13] The parties stipulate that after the voyage was terminated, plaintiffs' wages remained unpaid for 395 days.[14]

However, defendants contend that sufficient cause existed for failure to timely pay wages and they disagree on who is liable for the penalty wages.

## II. *Was there sufficient cause for delay?*

In construing § 10313's predecessor, § 596, the United States Supreme Court defined "without sufficient cause" to connote conduct that is arbitrary, willful, or unreasonable, or at least a failure not attributable to inability or impossibility of payment.[15]

Defendant Kramo Transportation contends that it was unable to make payment because of its financial inability and argues that the seizure of the vessel in Panama for nonpayment of debts is proof of this financial instability. Defendant contends that there are no facts before the Court upon which it can be concluded that the delay in payment was either willful, arbitrary or unreasonable.

■ Once the seaman establishes delay in the payment of wages, the burden of proof falls upon the master to show that the delay was justified.[16] Financial insolvency and arrest of the vessel constitutes "sufficient cause" for failure to make payment.[17] The parties stipulate that the vessel was seized and eventually sold for nonpayment of debts,[18] but they do not stipulate either that payment was withheld without sufficient cause, or that defendant was insolvent. However, a determination can

11. *Henry v. S/S Bermuda Star*, 863 F.2d 1225, 1240 (5th Cir.1989), citing *American Foreign Steamship Co. v. Matise*, 423 U.S. 150, 160, 96 S.Ct. 410, 416, 46 L.Ed.2d 354 (1975), *reh'g denied*, 424 U.S. 979, 96 S.Ct. 1488, 47 L.Ed.2d 750 (1976).

12. Stipulation m.

13. Agreed Stipulation 2.

14. Stipulations n, o.

15. *McCrea v. United States*, 294 U.S. 23, 30, 55 S.Ct. 291, 294, 79 L.Ed. 735, *reh'g denied*, 294 U.S. 382, 55 S.Ct. 443, 79 L.Ed. 933 (1935).

16. *Smith v. Western Offshore, Inc.*, 590 F.Supp. 670 (E.D.La.1984) (Arceneaux, J.), citing *Arguelles v. U.S. Bulk Carriers, Inc.*, 408 F.2d 1065 (4th Cir.1969), *aff'd*, 400 U.S. 351, 91 S.Ct. 409, 27 L.Ed.2d 456 (1971).

17. *Collie v. Fergusson*, 281 U.S. 52, 50 S.Ct. 189, 74 L.Ed. 696 (1930); *Arguelles v. U.S. Bulk Carriers, Inc.*, 408 F.2d 1065 (4th Cir.1969), *aff'd*, 400 U.S. 351, 91 S.Ct. 409, 27 L.Ed.2d 456 (1971).

18. Stipulation y.

be made on summary judgment nonetheless.

In *Celotex Corp. v. Catrett*,[19] the Supreme Court held that summary judgment is appropriate in a case in which a party cannot make a showing sufficient to establish the existence of a genuine issue of material fact, where the issue is one on which that party has the burden of proof at trial. The party moving for summary judgment need not negate an element necessary for the other's case; he simply can ask that the party "put up or shut up." The opposing party then must go beyond the pleadings and offer proof of his claim. A complete failure of proof of an essential element of the party's case renders the facts immaterial, allowing summary judgment.

In this action, the burden is on defendant to show that the delay in payment was justified. Defendant has offered no evidence to support its claim of financial insolvency. The seizure of one vessel of a corporation fails to prove that the corporate shipowner has no other assets or is insolvent. Thus, defendant has not carried its burden of proof sufficiently to establish a question of material fact with regard to its defense. Summary judgment in favor of plaintiffs on this issue is appropriate.

### III. *Who is liable for wages?*

46 U.S.C. § 10313 provides that penalty wages are owed by the owner or master of the vessel. Penalty wages are not owed by the employer of the vessel's crewmembers.[20] Plaintiffs have named both Kramo Limited (UK) and Kramo Transportation, Inc. as defendants. Plaintiffs contend that Kramo Transportation is liable as legal owner of the vessel because it is shown to be the vessel's owner on the documentation of the vessel.

Plaintiffs concede that Kramo Limited was the plaintiffs' employer[21] and not the record owner of the vessel. However, plaintiffs contend that Kramo Limited is liable as the equitable owner of the vessel. They argue that Kramo Transportation merely was a shell corporation, whose corporate structure should be disregarded, because Kramo Limited paid the purchase price of the vessel and controlled the purchase transaction. Plaintiffs also contend that Kramo Limited was the operator of the vessel. They argue that because the master of a vessel is an agent of the operator, the master's failure to make timely wage payments subjects the operator to liability.

Defendant Kramo Limited contends that because it is not the legal owner of the vessel, it cannot be liable for the crew's wages. Defendant Kramo Transportation argues that although a bill of sale, as well as an application for redocumentation, transferred the vessel to it, none of these documents were recorded with the Coast Guard. Thus, defendant argues that it cannot be held to be the owner. Kramo Transportation also argues that it never had authority to purchase the vessel, nor were its own funds used. Finally, Kramo Transportation argues that a non-employing vessel owner cannot be sued in personam for unpaid wages, citing Judge Arceneaux's decision in *Smith v. Western Offshore, Inc.*[22]

It is clear that Kramo Transportation is liable for the penalty wages as legal owner of the vessel. The parties have stipulated that on October 17, 1989, the option to purchase the M/V ACADIAN LIBERTY was exercised, and Mr. Johnston designated Kramo Transportation, Inc. as the entity to be shown as the purchaser on the bill of sale.[23] The parties also have stipulated that on November 17, 1989, Acadian Liberty, Inc. sold the M/V ACADIAN LIBERTY to Kramo Transportation, Inc. in a transac-

---

19. 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

20. *Caldwell v. Solus Ocean Systems, Inc.*, 734 F.2d 1121, 1122 (5th Cir.), *cert. denied*, 469 U.S. 1019, 105 S.Ct. 434, 83 L.Ed.2d 360 (1984).

21. Supplemental brief in support of plaintiffs' motion for summary judgment, p. 3–4; Stipulation u.

22. 590 F.Supp. 670 (E.D.La.1984) (Arceneaux, J.).

23. Stipulation k.

tion before Mr. Charles Meyer of New Orleans, Louisiana.[24] Whether Kramo Transportation or Mr. Johnston had the authority to purchase the vessel is not a material fact because it does not affect who the owner of the vessel was at the time the seamen's wages became due. In fact, Mr. Johnston purchased the vessel on behalf of Kramo Transportation, and Kramo Transportation was the legal owner at that time.

Kramo Transportation, Inc. argues that even if it was the owner, it cannot be liable in personam as a non-employing owner, citing *Smith v. Western Offshore, Inc.*. In *Western Offshore*, my brother Arceneaux wrote:

> Under certain circumstances not involved herein, the vessel owner may be liable for the seaman's wages (citations omitted). However, "[n]either policy nor precedent permits a seaman to sue a nonemploying owner *in personam* for ... wages." [25]

Because the case was one for penalty wages under 46 U.S.C. § 596, it is unclear why vessel owner liability was not a circumstance involved in *Western Offshore*. The statute explicitly provided for vessel *owner* liability. Judge Arceneaux further wrote:

> "An *employer* who, without sufficient cause, refuses or neglects to make wage payments must pay the seaman two days' pay for every day payment is delayed beyond the prescribed period. 46 U.S.C. § 596." [26]

However, the statute explicitly provided that the master or *owner* must pay wages. Finally, Judge Arceneaux cited *Baker v. Raymond Int'l, Inc.*[27] for the quotation: "[n]either policy nor precedent permits a seaman to sue a nonemploying owner *in personam* ... for wages." The *Baker* case involved a Jones Act seaman who was suing the vessel owner for maintenance,

cure, and wages. The Fifth Circuit in *Baker* found that these liabilities under general maritime law were the responsibility of the employer and the vessel in rem. The Court's statement was made to explain the peculiar relationship between the seaman and his vessel and to distinguish between the responsibility of the vessel versus the vessel owner. A wage statute providing explicitly for owner liability was not involved. Therefore, although *Western Offshore* also was a wage penalty case, it is not persuasive.

Section 10313(g) of the Penalty Wage Statute explicitly provides that the owner or master is liable for wages. When the Statute was revamped in 1983,[28] Congress left intact the words that the *owner* or master is liable for the wages due. There are no exceptions for, explanations of, or references to nonemploying owners and no distinctions are made. Accordingly, Kramo Transportation, as owner of the vessel, is liable for the penalty wages plaintiffs' seek.

■ The more difficult question is whether Kramo Limited also is liable for plaintiffs' wages. Plaintiffs ask that the Court "pierce the corporate veil" and find that, although Kramo Transportation is the legal owner of the vessel, Kramo Limited is the equitable owner. Ordinarily, a creditor has recourse only against the corporate entity incurring the liability, not against parent corporations or other parties connected with the entity.[29] Under exceptional circumstances, however, the courts will exercise their equitable power to hold controlling parties liable for the obligations of their instrumentality. One such instance is when a principal so dominates the activities of a corporation that it is necessary to treat the dominated corporation as an agent of the principal.[30] The Fifth Circuit has di-

---

**24.** Stipulation u.

**25.** *Smith,* 590 F.Supp. at 675.

**26.** *Id.* at 676 (emphasis added).

**27.** 656 F.2d 173 (5th Cir.1981), *cert. denied,* 456 U.S. 983, 102 S.Ct. 2256, 72 L.Ed.2d 861 (1982).

**28.** See *supra* footnote 9.

**29.** *Baker,* 656 F.2d at 173.

**30.** *Id.* at 180, referring to *Krivo Indus. Supply Co. v. Nat'l Distillers & Chem. Corp.,* 483 F.2d 1098, 1102–03 (5th Cir.1973), *reh'g denied,* 490 F.2d 916 (5th Cir.1974).

rected that to justify the extraordinary step of holding the dominant party liable, the jury must find that this control:

> "amounts to a total domination of the subservient corporation, to the extent that the subservient corporation manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation." [31]

The Fifth Circuit suggested that in order to decide whether total domination has been exercised, the following factors should be considered, none of which is dispositive nor exhaustive: 1) common stock ownership, 2) common directors or officers, 3) whether the dominant corporation finances the subservient corporation, 4) whether the dominant corporation caused the incorporation of the subservient corporation, 5) whether the subservient corporation operates with grossly inadequate capital, 6) whether the dominant corporation pays the salaries and other expenses or losses of the subservient corporation, 7) whether the subservient corporation receives any business except that given to it by the dominant corporation, 8) whether the dominant corporation uses the subservient corporation's property as its own, and 9) whether the directors and officers of the subservient corporation act independently in the interest of that company, or whether they take their orders from the dominant corporation and act in the dominant corporation's interest.[32] Courts should be hesitant to disregard the corporate entity.[33]

In this case, the parties have stipulated that Mr. Larry Johnston was employed by Kramo Limited[34] and that he was given authority in the charter agreement to exercise an option to purchase the vessel on behalf of Kramo Transportation.[35] Kramo Limited authorized and permitted Mr. Johnston to charter and later to purchase the M/V ACADIAN LIBERTY.[36] Mr. Johnston exercised the option and designated Kramo Transportation as the purchaser.[37] Kramo Limited provided the money to purchase the vessel.[38] Finally, Mr. Johnston arranged for the voyage of the vessel from Houma, Louisiana to Seattle, Washington.[39]

It appears that Kramo Limited controlled the purchase of the vessel and the voyage on which this controversy is based. However, plaintiffs have provided no evidence regarding stock ownership, the board of directors, other expenses paid for by Kramo Limited, from what source Kramo Transportation derives any other business, and whether Kramo Transportation operates with grossly inadequate capital. Plaintiffs have the burden of proving that Kramo Transportation is a shell, and they have not done so under the standards of *Celotex*. Thus, Kramo Limited cannot be liable as an owner of the vessel.

### IV. Can the vessel's master recover?

■ Defendants contend that the master of the vessel, Kendall George, cannot recover penalty wages under the Statute because it provides for recovery by "seamen." The United States Supreme Court, in *Warner v. Goltra*,[40] held that master's wages are not protected by the Penalty Wage Act. Although the *Warner* Court held that masters are considered to be seamen for recovery under the Jones Act, the Court distinguished the Jones Act definitions of master and seaman from the definitions applicable in wage claim cases. The Court stated:

> A goodly number [of statutes] give a remedy to seamen for wages wrongfully withheld, or define terms of payment

---

**31.** *Id.* at 181, citing *Krivo Indus. Supply Co.,* 483 F.2d at 1106.

**32.** *Id.* at 180.

**33.** *See e.g., Maley v. Carroll,* 381 F.2d 147, 153–54 (5th Cir.1967).

**34.** Stipulation f.

**35.** Stipulation e.

**36.** Stipulation i.

**37.** Stipulation k.

**38.** Stipulation l.

**39.** Stipulation w.

**40.** 293 U.S. 155, 55 S.Ct. 46, 79 L.Ed. 254 (1934).

that agreement may not vary. In respect of dealings of that order, the maritime law by inveterate tradition has made the ordinary seaman a member of a favored class. He is a "ward of the admiralty," often ignorant and helpless, and so in need of protection against himself as well as others. The master, on the other hand, is able in most instances to drive a bargain for himself, and then when the bargain is made, to stand upon his rights. Discrimination may thus be rational in respect of remedies for wages.[41]

Four years later the Court expressly held that masters' wages were not protected by a related wage-protection statute, 46 U.S.C. § 601. The decision turned upon an interpretation of the definitional section, 46 U.S.C. § 713, that also gives content to the terms "master" and "seaman" in the penalty wage statute.[42]

Additionally, the Fifth Circuit affirmed Judge Rubin's holding in *Ramsey v. M/V Modock*,[43] while he was then a district judge, that 46 U.S.C. § 596 was limited to claims by seamen and did not afford recovery of double wages by the master. The Court wrote that unless time had undercut *Warner* and *Blackton*'s rationale or Congress had overridden them, these decisions must govern.

That time has undercut the rationale of disallowing recovery by the master is plaintiffs' argument. They argue that the realities of modern shipping, including corporate ownership and operation of vessels, have eroded the logical underpinning for the original exclusion of the master.

The *Ramsey* Court discussed that although Congress recently had amended Title 46 to give masters, as well as seamen, a lien on a vessel for unpaid wages, Congress did so to reflect a concern for the position of the master's wage claim in bankruptcy rather than because of a broad desire to equalize masters' and seamen's wage remedies. The Court found most compelling what Congress chose not to do in expanding the wage protection scheme of Title 46. Congress was aware of modern conditions and the changed role of a master when it made those revisions, yet it did not extend the penalty wage remedy to masters.

Once again, Congress altered Title 46 in 1983 and it did not choose to change the language of the Penalty Wage Statute, nor did it extend the Statute to masters. The Statute's words must be given their plain meaning and precedent and Congress' intent must be deferred to. Although the trend in other areas of maritime law may be to favor inclusion of the master in remedies afforded to seamen, as certainly it should, 46 U.S.C. § 10313 still provides a remedy only to seamen, and not to the master, of a vessel. It is up to Congress, rather than the courts, to change the language of the provision. Plaintiff William Kendall George was the captain of the vessel[44]. Accordingly, although unequitable, Mr. George may not recover penalty wages in this action.

## V. *Attorney's Fees and Interest*

■ Finally, plaintiffs ask for prejudgment interest and reasonable attorney's fees equal to 50% of the double wage award. There is no statutory authority for an award of attorney's fees. The United States Supreme Court, in *Alyeska Pipeline Service Co. v. Wilderness Society*,[45] traced the history of allowing attorney's fees and found that, in the absence of statutory authority, the general "American Rule" refuses to allow attorney's fees to be awarded to the prevailing party. The Court, however, noted the continued vitality of the

---

**41.** *Id.* at 162, 55 S.Ct. at 49.

**42.** *Blackton v. Gordon*, 303 U.S. 91, 58 S.Ct. 417, 82 L.Ed. 683 (1938).

**43.** 372 F.Supp. 1131 (E.D.La.1974) (Rubin, J.), *aff'd*, 546 F.2d 908 (5th Cir.1977).

**44.** *See* Plaintiffs' complaint, ¶ 30; Deposition testimony of Eric Penniman, p. 19; Deposition testimony of Kurt Lacoste, p. 78; Deposition testimony of Thomas Naquin, p. 34.

**45.** 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).

*Vaughan v. Atkinson*[46] exception which allows attorney's fees in instances of bad faith and the *Hall v. Cole*[47] exception which allows attorney's fees for a successful suit that benefits the members of a class. Plaintiffs ask that attorney's fees be awarded in this case on the basis of defendants' sheer recalcitrance. Although plaintiffs' wages were wrongfully withheld, there is no evidence that defendant behaved in bad faith. In fact, it has been unclear all along whether the Statute applied to this action at all. Additionally, the Statute's purpose is to provide for a penalty for the withholding of wages in bad faith. Awarding attorney's fees would seem to impose a double penalty. Thus, attorney's fees are inappropriate.

■ There also is no statutory authority for prejudgment interest. In general, absent a statutory mandate, an award of prejudgment interest in an admiralty action is committed to the sound discretion of the trial court.[48] With reference to the Statute, the few decisions addressing interest in the context of the Penalty Wage Statute also found that whether to award prejudgment interest is within the trial court's discretion.[49] Although prejudgment interest may be discretionary, in the Fifth Circuit the general rule is that prejudgment interest is the rule rather than the exception.[50] The district court may deny prejudgment interest only when peculiar circumstances would make such an award inequitable.[51] Such peculiar circumstances include: 1) an improper delay of the action caused by the plaintiff; 2) a genuine dispute over a good faith claim in a mutual fault setting; 3) equitable considerations which caution against an award; and 4) a damage award substantially less than that claimed by the plaintiff.[52] No such peculiar circumstance is relevant to this case and it would not be inequitable to award prejudgment interest. Thus, an award of prejudgment interest is appropriate.

Defendant Kramo Transportation is liable under 46 U.S.C. § 10313 for penalty wages to plaintiffs Tommy Naquin, Charles Neese, and Eric Penniman. Subsection (g) provides that defendant is liable for two days' wages for each day payment is delayed. The parties have stipulated that plaintiffs' wages remained unpaid for 395 days.[53] The parties also have stipulated the following: plaintiff Tommy Naquin earned $140 per day serving aboard the M/V ACADIAN LIBERTY; plaintiff Charles Neese earned $65 per day serving aboard the M/V ACADIAN LIBERTY; and plaintiff Eric Penniman earned $140 per day serving aboard the M/V ACADIAN LIBERTY.[54]

Accordingly,

IT IS ORDERED that plaintiffs' motion is granted in part and denied in part; defendant Kramo Transportation's motion is granted in part and denied in part; and defendant Kramo Limited's motion is granted. IT IS FURTHER ORDERED that plaintiff Tommy Naquin is awarded $110,600; plaintiff Charles Neese is awarded $51,350; and plaintiff Eric Penniman is awarded $110,600; all awards to be paid by defendant Kramo Transportation, Inc. with interest from the date of judicial demand.

---

**46.** 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88, *reh'g denied,* 370 U.S. 965, 82 S.Ct. 1578, 8 L.Ed.2d 834 (1962).

**47.** 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973).

**48.** *Marathon Pipe Line Co. v. M/V SEA LEVEL II,* 806 F.2d 585 (5th Cir.1986), *reh'g denied,* 811 F.2d 602 (5th Cir.1987).

**49.** *See, e.g., Lewis v. Texaco, Inc.,* 527 F.2d 921, 926 (2d Cir.1975).

**50.** *Orduna S.A. v. Zen–Noh Grain Corp.,* 913 F.2d 1149, 1157 (5th Cir.1990).

**51.** *Id.*

**52.** *Id.* at 1157–58.

**53.** Stipulation o.

**54.** Stipulations p, q, r.